# JANUARY TERM, 1896.*

## WEBSTER v. SYMES.

1. NEGLIGENCE—DAMAGE BY FIRE—QUESTION FOR JURY.

In an action to recover damages for the loss of property by fire alleged to have been communicated, during a violent wind, by sparks from defendant's steam sawmill, the question of whether the drafts in the furnace were open is properly left to the jury, where defendant testified that sparks could not escape if the drafts were closed, and there was evidence that sparks did escape, and defendant's witness testified that certain drafts were partially open.

2. STEAM MILLS—SPARK ARRESTERS—DUTY TO PROVIDE.

Where a steam sawmill is run in proximity to inflammable material and buildings, and the chimney is found to emit sparks so as to endanger the surrounding property, the operator must avail himself of such apparatus to arrest their escape as experience has shown to be reasonably adequate for that purpose.

3. SAME—CUSTOM.

The fact that it is not customary to employ spark arresters where there are no artificial drafts will not excuse the owner of a steam sawmill, operated with a natural draft, for his failure to provide them, if common prudence requires their use in the particular case.

4. NEGLIGENCE—WHAT CONSTITUTES.

Negligence is properly defined to be "a failure of duty to observe that degree of care which the law imposes for the protection of interests likely to be injuriously affected by the want of it."

5. SAME—DEGREE OF CARE—INSTRUCTIONS TO JURY.

An instruction that, if the violence of the wind and the dryness of the surrounding property endangered such property by fire from a steam sawmill to the extent that a "prudent"

* Continued from Vol. 108.

man would have shut down the mill, the failure to do so was negligence, is not erroneous as requiring too high a degree of care,—especially where the jury are subsequently instructed that the operators of steam sawmills are only required to use ordinary care to protect surrounding property.

6. SAME.

In an action for negligently setting fire to plaintiff's property, where the fire was communicated from another fire set by a spark from defendant's mill, an instruction that defendant is liable if plaintiff's property was burned without her fault, by the negligent operation of the mill, and the injury was the result of a continuous succession of events, so linked together as to make a natural whole, even though defendant could not have anticipated such injury, is not misleading as permitting a verdict for plaintiff although defendant could not have anticipated that any injury would result, the circumstances being such that the jury would readily construe the charge to mean that, even though the defendant's negligence did not, in the first instance, cause plaintiff's property to take fire, yet, if it ultimately did take fire as a result of defendant's negligence, she was entitled to recover.

Error to Missaukee; Aldrich, J. Submitted March 3, 1896. Decided March 24, 1896.

Case by Mary E. Webster against James E. Symes and another for the value of certain property destroyed by fire alleged to have been set by sparks from defendants' mill. From a judgment for plaintiff, defendants bring error. Affirmed.

*F. O. Gaffney* and *M. Brown*, for appellants.

*S. B. Daboll* and *O. L. Spaulding*, for appellee.

MONTGOMERY, J. This is an action for negligently causing the destruction of plaintiff's property by fire. The defendants are the owners of a steam sawmill in the village of McBain, and plaintiff occupied an hotel in the same village.

The declaration, in the first count, averred the own-

ership and occupancy of plaintiff's property, and further averred:

"The said defendants were also possessed of lot number nine in the said village of McBain, lying near to, and westerly of, the said premises of the said plaintiff, on which was a sawmill, then and there, by the said defendants, their employés and servants, being operated and run by steam power, generated by fire in a furnace located in or about said mill; and at the time and place aforesaid the lands, premises, buildings, and other property about said mill and village, and the said hotel and barn of said plaintiff, were dry, and liable to take fire and burn from any fire, sparks, or cinders that might come and lodge thereon; and a strong wind was then blowing from the west towards the east, and towards the said hotel and barn of the said plaintiff, calculated to, and which would, carry fire, sparks, and cinders, coming from said mill, easterly a long distance, along and upon the premises about said mill and village, and the said hotel and barn of the said plaintiff, and thereby set fire thereto, and burn and destroy the same; and by reason thereof the operation and running of the said mill by the said defendants as aforesaid was dangerous and hazardous, and liable to communicate fire therefrom to the premises and buildings about and adjacent to said mill, and to the said hotel and barn and property of the said plaintiff,—of which the said defendants were then and there well knowing.

"And the said plaintiff avers that it then and there became and was the duty of the said defendants, in the operating and running of the said mill, to use care and caution in and about the same, to prevent the taking and spreading of fire therefrom in and upon the said premises and buildings, and the said hotel and barn and property of the said plaintiff, and the injury and burning of the same, and to protect and care for the fire in and about said furnace, and the smokestack of said mill, connected therewith, with dampers, screens, spark arresters, or other suitable devices, as to prevent the escape and spreading abroad from the same of fire, sparks, or cinders, and the setting of fire thereby to, and injuring and burning, the said premises and buildings, and the said hotel, barn, and other property of the said plaintiff; and it also became and was the duty of the said defendants, because of the great violence of the wind then blowing as afore-

said, from the west, towards the said premises and buildings, and the said hotel and barn of the said plaintiff, and to prevent injuring and burning the same, to cease operating and running said mill, and to shut down the same, and put out the fires in said furnace during the prevalence of said wind.    *    *    *

"The defendants did not shut down the mill,    *    *    * and the said defendants then and there so carelessly, negligently, and improvidently operated and ran said mill, and managed, directed, and conducted said fires in said furnace and smokestack, that, by and through the carelessness, negligence, and mismanagement of the said defendants in and about said fire, fire, sparks, and cinders from said furnace and smokestack escaped therefrom, and were carried by the wind, blowing as aforesaid, to and upon lot four of said village, lying east of said mill, and occupied by the said defendants, and into and upon the hay, straw, and litter lying in and about a certain barn thereon, so that the said barn, by reason thereof, took fire therefrom, and was utterly burned, consumed, and destroyed; and it became and was impossible to put out or check said fire, and it then and there spread and extended easterly therefrom to the said hotel and barn of the said plaintiff, standing and being on said lot three of said village."

The second count, in addition to the averment as to conditions and surroundings, averred that it was the duty of defendants to provide a spark arrester or other device to prevent the spreading about from the smokestack of cinders, and the setting of fire thereby, and that it was the duty of defendants, because of the violence of the wind so blowing, etc., to cease operating the mill during the prevalence of the wind, and averred that defendants failed of their duty in this regard.

The testimony in most parts was conflicting. The plaintiff offered testimony tending to show that, on a previous occasion of a high wind, in a dry time, defendants had been requested to shut down the mill by the village marshal, and had recognized the propriety of the request, and had done so; that, on the day in question, a live spark had, during the noon hour, been blown into the barn

where the fire afterwards originated from (it is claimed) a similar cause; that, during the forenoon of the same day, a stump in the street a little north and east of the barn, but in the same general direction from the mill, caught fire; that, previous to this, a live spark had fallen on the person of one of defendants' employés in the mill yard, about 150 feet from the smokestack, and on other occasions the smokestack had been seen to emit sparks. There is no controversy but that the wind was very high upon the day in question. It is conceded that defendants were running the mill, and were not using spark arresters. There was a dispute as to whether the direction of the wind was such as to carry sparks from the smokestack to the barn in question, but this was a fair question for the jury.

It is stated, in defendants' brief, that the evidence was undisputed that the drafts in the furnace were closed, and not open, from some time in the forenoon, before the fire, and that it was also undisputed that the kind of fuel that defendants were using that day was not calculated to communicate fire from the smokestack; but we find that the record hardly sustains this statement, as we find the defendants' witness, in charge of the furnace, testified:

"When the draft is entirely open, it would depend something upon the force of the wind whether we got much or little draft. Sometimes, when the wind is blowing hard, we can get as much draft with those little circle doors open as we can with everything open with less wind. On this day the wind was blowing violently, and I had the circle doors partly open, and that constituted the draft. A small opening, with a big wind, may produce as good a draft as a large opening with a light wind."

And there was other testimony tending to show that the drafts were open some of the time. Moreover, the very fact that the cinders were emitted, and that this, according to the defendants' testimony, could not have occurred with the drafts closed, might be considered by the jury in determining whether the drafts were closed at

the time or not. *Cheboygan Lumber Co.* v. *Delta Transportation Co.*, 100 Mich. 24; *Alpern* v. *Churchill*, 53 Mich. 613.

The boiler in which steam was generated was a tubular boiler, arched in with brick. The fire box was in the front end of the boiler. Under the fire box was a place for the draft to come in from the doors in front. There was a fire or cinder box at the back of the boiler. Fire had to go to the back end of the boiler, and return, through the flues in the boiler, to the front end of it, where the smokestack was located. The smokestack was 3 feet in diameter and 85 feet high. There was no artificial draft used. Defendants called a number of witnesses, who testified that, when no artificial draft was used, with a mill constructed like this, no spark arrester was used or required; and among the claims made is that, as such spark arresters are not generally employed in such mills, the defendants cannot be charged with want of ordinary care in failing to provide one. Unquestionably, this is, in general, a fair test of common prudence, but conditions differ with different mills. The defendants' witness testified that a spark arrester would lessen the danger of a mill with a natural draft, if it had a tendency to emit sparks. Another of defendants' witnesses gave similar testimony; and, indeed, without the aid of the testimony, we could take judicial notice of the fact. There was not only abundant testimony that this mill did emit sparks, but it further appeared that it was located near wooden structures, liable to take fire from sparks emitted. This was a stationary structure, and its owner must be held to know the conditions and surroundings. The case, in that respect, is almost an exact parallel to *Hoyt* v. *Jeffers*, 30 Mich. 181. In that case Justice CHRISTIANCY, in speaking for the court, said:

"I am entirely satisfied, both upon principle and the weight of authority, that when, as in the present case, as the evidence tends to show, the mill is situated in the midst of a city, with numerous dwellings, hotels, shops,

and other buildings in close proximity, and mostly of wood, and the mill chimney, without any apparatus, contrivance, or appliance for arresting the escape of sparks and fragments of burning material, generally, or even frequently, throws out such sparks and burning material to such an extent as to endanger surrounding buildings and property, and actually, on many occasions, to set them on fire, especially when the mill owner or his employés in charge have notice of the danger, it becomes both his moral and his legal duty to avail himself of some such apparatus, or other means, if any be known, as experience has shown to be reasonably adequate, if not the most effectual, to arrest the escape of such sparks and fire from his chimney, whether such means or apparatus had ever been previously used upon that particular kind of chimney or not, so that they are in their nature and operation susceptible of being applied to that kind of chimney, and would operate to prevent or check the escape of such fire and sparks if so applied."

The only particular in which *Hoyt* v. *Jeffers* was a stronger case for the plaintiff than the present case is for this plaintiff, is that in Hoyt's case fire had previously caught, but in this case no previous actual damage had been done, other than the burning of the clothes of the workman in the yard; but the proof was ample that the mill emitted sparks which were carried considerable distance.

What has been said sufficiently answers the objection of defendants' counsel to questions, put on the cross-examination of their witnesses, as to whether a mill with a direct draft might not be so constructed as to cause a draft equal to that of some other mills having artificial drafts, and as to the purpose of putting on spark catchers, and as to whether spark arresters would lessen the chances of fire, and as to whether, in fact, under some conditions, the spark arresters were not used when the draft was a direct one.

Error is assigned on certain instructions given by the court. The definition of negligence given by the court was: "A failure of duty to observe that degree

of care which the law imposes for the protection of interests likely to be injuriously affected by the want of it." This definition was approved in *Kendrick* v. *Towle,* 60 Mich. 367.

Defendants complain of an instruction as follows:

"If the jury find, from the evidence, that, from the violence of the wind then blowing, and the dryness of the atmosphere and the immediate surroundings of the mill and the plaintiff's property, the operating of the mill endangered the plaintiff's property, by fire from the mill, to that extent that a prudent man, conversant with the business and the existing conditions, would have shut down said mill until the violence of the wind had abated, the failure of the defendants to do so was negligence; and if, by reason of such negligence, fire was communicated from said mill to the barn, and then to the plaintiff's property, and destroyed it, she is entitled to a verdict, if she did not contribute to the injury; and this would be so, even if defendants made use of fire or spark arresting appliances on their mill.   It was the duty of the defendants, if, in the operating of their mill, they thereby endangered plaintiff's property by fire, to use such reasonable means as were known to them, or were in such general use that, by reasonable care and inquiry, they might have known of them, to prevent fire from said mill from spreading to or falling upon plaintiff's property and injuring it, and, if they omitted to use such means, such omission was negligence; and if the jury find, from the evidence, that such negligence directly caused the firing of the barn and the plaintiff's property, and its destruction, she is entitled to a verdict, if she did not contribute to the injury."

It is contended that this instruction was erroneous, for the reason that it left it for the jury to determine what a prudent man would have done.   It is said that the measure of liability in such cases is the skill and diligence of men of ordinary care, and not the most prudent or careful man.   The use of the word "prudent" without qualification would hardly be understood by the jury as meaning more than "ordinarily prudent."   If there be any doubt of this, the subject is made clear

by a later portion of the charge, in which the court said to the jury:

"Persons operating mills propelled by steam power are not insurers of property situated about the mill. All they are required to do is to use ordinary care to protect such property from being destroyed or damaged."

Exception is taken to an instruction that—

"If defendants were guilty of negligence in operating their mill, and the burning of the plaintiff's property was occasioned thereby, they are liable to the plaintiff, if she was without fault, for the result of the injury to her, if such injury was the result of a continuous succession of events, so linked together as to make a natural whole, and flowed naturally from such negligence; and this even if they could not have foreseen or anticipated such injury."

Defendants' counsel construe this as being equivalent to saying that the defendants might be liable, even if it was impossible for them to have foreseen or anticipated that any injury might result in consequence of their operating the mill in the manner in which they did. We do not so construe the language. It was intended to give the jury to understand that, even though the negligence of defendants did not, in the first instance, cause plaintiff's property to take fire, yet, if it ultimately did take fire as a result of defendants' negligence, she was entitled to recover. The jury could not well have misinterpreted the language, and, in view of other portions of the charge, could not have been misled.

The defendants also assign error on the refusal of certain of their requests. In so far as they are not inconsistent with the views herein expressed, they are fairly covered by the charge of the court as given. The case was carefully tried, and no error is discovered.

Judgment affirmed, with costs.

The other Justices concurred.